Case number 25-1053, Brayton Groth v. City of Birmingham, Michigan. Argument is not to exceed 15 minutes per side. Ms. Combs for the appellant. Good morning, Your Honors. Brianna Combs on behalf of Defendants Appellants Lt. Fays and Officers Hill and McIntyre. I would like to please reserve four minutes for rebuttal. We have three claims at issue in this appeal. We have an excessive force claim under the Fourth and Fourteenth Amendments, and then two state law claims for assault and battery and malicious prosecution. I know this court is intimately familiar with the facts as shown in the body cam video, so I will not belabor the facts. There's just a few things I'd like to point out. I do want to emphasize that domestic violence calls, as we have here, are serious and dangerous, and the fact that Catherine fled the house in this case shows that this was a dangerous situation. Catherine told Officer Crum, who reported to her vehicle when she had parked a little bit farther down the road from the house, after fleeing the house, that plaintiff threw her out of the home by her hair and also threw coffee on her. Let me ask you this. Are you willing to concede the facts in the light most favorable to the plaintiff in this case? I know there's a video, but when I look at your brief, it's written almost, you know, the facts that you look at are really from the standpoint of the officers. And at this point, we generally take the facts in the light most favorable to the plaintiff in this type of situation. So are you willing to concede the facts in the light most favorable to the plaintiff? What I will say, Your Honor, is that this court looks at the facts in the light depicted by the video, and then if there's any gaps in the video, then we would view the facts in the light most favorable to the plaintiff. One gap in the video is right on entry. There's nothing that shows that the plaintiff struck the officer. At least I don't see that on the video. I probably haven't looked as many times as you have. But I don't see that depicted on the video. And, of course, the plaintiff testifies that he didn't do that. So how do we view that particular fact? I think that's really important here. Yeah, and I acknowledge that. Officer Fay's body cam was angled downward a little bit, so you can't see above his head. But I will say, and we cited this case in our reply brief, which is Fagan. It's a published case from this court that actually came out after we filed our principal brief. In that case, this court held the absence of evidence, such as any limitations on what the video shows, cannot create genuine issues of material fact. And I think, at the very least, the video— In Fagan, the video, I think, was clear in all relevant aspects. I mean, with respect to whether the plaintiff hit Lieutenant Fay's in the face or not, the video isn't clear. I mean, I can't tell. None of us can tell. And there's conflicting testimony. So in the light most favorable to the plaintiff, he didn't hit him, right? I mean, how can we conclude otherwise? Yeah, I would agree with Your Honor that the video does not show definitively that he struck Lieutenant Fay's in the face. But what it does show, at the very least, is that he shoved the door in the officer's face and that— Yeah, no, there may be other aspects of resistance, for sure. But with respect to that, and I think that, I guess, my reading of your brief is probably the same as Judge Mathis, it seemed like you were taking it as a given, for example, that he struck the officer in the face. And I mean, if you're not willing to concede the facts in the light most favorable to the plaintiff, then we don't have jurisdiction over the appeal, right? I mean, that's the problem. So, I mean, I suppose regardless we have the video, and I suppose your position would simply be from whatever we can see in the video, we can come out your way. Let me ask you—go ahead. I was just going to say that not only we have to judge it, but doesn't like the seminal cases, Scott v. Harris, and when the district judge has told us what the view of the facts are, the video has to be blatantly contradicted, does it not? It's not just we look at it, meh, we kind of think such and such. Isn't that the law from Scott v. Harris? Yes, that's the law, Your Honor. But in Fegan, I think this court explored that a little bit further and said when we have— and I'm quoting here, it says, especially with video evidence available here and elsewhere, we can assess many of the facts for ourselves regardless of how the parties portray them, filling in any holes with plaintiff's evidence and the defendant's uncontested evidence. So that's what we're asking the court to do here. This court can look at the video independently because we have the subjective video evidence, and then if there's any gaps, as Your Honors are saying, then that's when we view those in the light most favorable to the plaintiff. But there's very little defendant's uncontested evidence here in terms of once they got to the door. Isn't that fair? The part you were quoting talks about what you can rely on the defendant's uncontested evidence. Let me ask you one other question, which is this beginning with the key, does that make any difference? That is, if the officer's entry is completely unlawful, does that change the calculus once the police get inside the house? I'm not determining at this point that it is, but I'm asking you in terms of the law about what deference we give to the officer's subjective beliefs and so on. Yes. We cited a few cases that aren't brief. If the officers are met with immediate aggression, then they can act immediately. This is the Lange v. California case. If the initial entry is illegal, if it violates the Fourth Amendment, he is permitted to come up to them and say, where's your warrant, and try to shut the door, isn't he? I mean, he is actively resisting. He's verbally resisting, perhaps. I mean, our cases aren't entirely clear on this, and I suppose that helps you ultimately. But if the initial entry is illegal, why is he not permitted to say, go away, and you don't have consent to enter my house? I mean, doesn't that determine everything at that point? Because then the level of resistance that he's putting up doesn't seem to be problematic if it's an illegal entry. I mean, didn't the district court seem to think that, right? The district court seemed to think that he was revoking consent. Right, and the district court cited the Georgia v. Randolph case. But I think there's a key distinguishing fact between this case and Georgia v. Randolph, and the Supreme Court in Georgia v. Randolph even discussed that. And the court said our holding in this case has no bearing on the capacity of the police to protect domestic violence victims. And I think that's what we hear. There's no domestic violence victim in the house, right? That's what Georgia v. Randolph is about. Well, I respect that, Your Honor, but I also think that we have the 911 call in this case where the whole reason that Catherine asked a bystander to call 911, one of the first things we hear her say on the 911 transcript is, I want somebody to go there to the house to make sure I'm not followed. And so I think that's key here. I mean, in a lot of these domestic violence situations, even if she was removed from the home, what if the police left and she went back to the home and then she was further assaulted? I mean, that's certainly a possibility, and I think it's very important for the officers to talk to both parties in this situation, and that's what they were trying to do. And right when they tried to open the door with the key, which she provided, the victim of domestic violence provided the key, gave her consent, right when they opened the door they were immediately confronted with active resistance and aggression. And really, if you look at the video, the officers were the whole time trying to restrain the plaintiff so that he wouldn't commit more violence against both of them and his wife if she were to return to the home. So I think that's key here that I hope the court considers. And then as to the excessive force claim, we also make this... What do you think the rule is in this situation in terms of the consent issue and a co-tenant revoking consent? So I think the rule is, and the court recognized this in Georgia v. Randolph, when you have these type of situations where the court said, where we can give greater recognition to the interests of one party over the other, such as where the defendant victimized the other party who gave consent, and that's the situation we have here. So I think by the victim of domestic violence giving her consent, even if the perpetrator who committed the domestic violence is in the house and says, no, you can't come in, I think that... Is it clear from the record what the purpose of their going into the house was? Were they going to arrest him because they had probable cause to believe that he had committed domestic violence? Or were they searching? It doesn't look like it was going to be a search. I mean, if it's a search, I think Georgia v. Randolph may... I mean, that simply would make... I mean, then he revoked the consent, right? In order for you to prevail, I think they can't be going in to search. They have to be doing something else. Is that right? I mean, I think there was testimony from, I believe, Lieutenant Fays and Officer Hill that they were going there to speak with Mr. Groff. Yeah, they just say speak with. I mean, at least initially they go to the front door. That sort of is nice. They claim that they announced, but he denies it and the judge doesn't credit it. So they're certainly, you know, she's got a story. We'd like to know your story. That's fine. The question of getting into the house and everything that follows that, I don't have the citation, but I had a case where the officers were getting a key to a locker from someone, and they say, can we have the key to the locker? And the man says, you've got the badge. I guess you can. And we said that wasn't consent. And if you read everything that she says here, you know, basically he says, you have no option, right? I respect your point, Your Honor, but I think I disagree with that. I think what Officer Crum said was, we need to speak with the other party, and he's not opening the door for us. Will you go back to the home with us and open the door? And she said, no, I don't want to go back there. And I think that demonstrates the emergent situation, that she didn't want to go back there, but she said, I will give you the key. And there was no, you have to give me the key. I mean, he did not say that, so I respectfully disagree with that. I don't think there was coercion. But I see my time is up, so I'll reserve it. I'm sorry, so they were going in to investigate? What's the purpose of them going in the house, to investigate? They were going in to speak with him as the other party who committed the domestic violence. But I think also, regardless of their subjective perception of why they were going in to the home, there was probable cause for them to make an arrest for domestic violence, and opposing counsel conceded that at the motion for summary judgment hearing, and said there was probable cause, he conceded that. So regardless of what the officer's subjective perception was, they had probable cause to make an arrest. Okay, thank you. Thank you. Counsel? Counsel? Good morning, Rob Kamenek. On behalf of the plaintiff, Appley, here. Judge Lawson got it right. He followed the rule in Schamati, who Judge Lawson happened to be the district court judge in Schamati as well. The problem that the defendants have, you've already hit on, they're between a jurisdictional rock and a Rule 56 hard place. Even here today, they're fighting on the facts. They're not viewing the facts in the light most favorable to the plaintiff. And they're doing it, as we all know, and we've been around this block countless times, is the question about resistance is the key to the excessive force case. And, again, I read the brief the same way the court did. At least two of the judges announced that. They're fighting. They're fighting all the way through. And their fight is to say that my client was fighting with the officers, at least when they came in. And that was not the case. Now, the court knows the rule. As you've mentioned, you've got conflicting deposition testimony. The only way you can negate one version of that is if the video blatantly contradicts that version. This video doesn't blatantly contradict anything. I read it the same way you do. So I'm not sure, in the first instance, at least on the excessive force, which is the key to this case, the court has jurisdiction. The defendants want to stick with that. I mean, I think this is a close case, honestly, because I think the question is whether if the initial entry into the home is legal and if he's not revoking consent, then the question is how much active resistance is he putting up to a legal entry into the home. And I'm not sure that it's clearly established, given our cases on verbal resistance, active resistance. I mean, we've got a lot of cases on this issue. And we've got a lot of cases that say essentially verbal resistance can, you know, the police are allowed to restrain you at that point. And if you're fighting them at all, then it's going to escalate. So, I mean, for me, it's really this initial entry is a big deal. And it's not really briefed very much by either side here. But I'm curious about whether Georgia v. Randolph governs, and that may not even be clearly established, whether he can revoke consent or not. What are your views on that? Well, he can revoke consent, and he did revoke consent. I think it's impossible to view the one video and think that he's not revoking consent. Okay, but is he permitted to revoke consent? Do you agree that Georgia v. Randolph isn't exactly this case, obviously? Georgia v. Randolph does seem to carve out some exception for domestic, something in the domestic violence sphere. There are a couple of cases that suggest that Georgia v. Randolph only applies if the police are going to conduct a search, not an arrest. What do you do with all of that? Well, here, let's start with the last point. The court asked the question, what was the purpose of going into the house? And the subjective testimony was we want to talk. We want to talk to my client. There was never any intent, and it's pretty clear that there wasn't any intent to arrest him when they walked into the house. They weren't searching the house, that's for sure. No claim on that at all. So what they did is they went into the house. They didn't, if they had an intent to arrest, they never said you're under arrest. That only happened when you listened to the video at the end. After all this, and presumably they are arresting him for resisting arrest. So the only reason they went into the house is to talk to him, and that's it. And when somebody, when law enforcement knocks on your door and they want to come into your house and they say they want to talk to you, you can say no, you're not going to walk in. Now, what's different here, it wasn't as if he originally gave consent and then he withdrew it. It was a third person, which was his wife. So I do think that's material here. Because at the end of the day, my client is the plaintiff and his wife is not. So what case is it that told them that once he revokes his consent, that was a valid revocation of consent? It overrode her consent? The case law you cited, Your Honor, that's the best I have for you today. What's that? The case law that you have cited here today, that's the best I have for you, the Supreme Court case. George V. Randolph? Correct.  And you are, unfortunately, in my case, and I think for both of us, you are right, I don't think that was briefed as deeply as it could have been. I will say that. But I do think under the facts, and I know you're talking about the governing law, that one way or the other he made it clear, and he repeatedly stated, what's going on here? Nobody told him he was under arrest. Basically, in my view, he told them to get out. And everything went from there. Because at that point in time, if he had revoked consent and they walked into the house without permission, then he had a right under Michigan law to go ahead and use reasonable force to resist them. And then we get into the question of whether or not there was active resistance and excessive force. He has a right to use that force under People v. Marino, cited in our brief, Michigan Supreme Court. So it's almost like a balancing act. You're looking at he has a right to use some force in response to their illegal conduct. And then they come in and they're claiming that he actively resisted. No, I don't think that's actively resisting. That's exercising your constitutional right to use reasonable force. It doesn't matter if you're the police. Do you even need that? When you say use reasonable force, are you sort of conceding that trying to close the door is the reasonable force? Or do we need that, that even when the officers get in, the video is at most ambiguous about whether he's doing anything when they throw him down? More the latter, Your Honor, because when they ---- I mean, if we had video of what he's doing and, you know, while they're, quote, throwing him down, that it might be a little bit able to overcome the judge. But we don't. We don't have any video that blatantly contradicts what the judge says. The point you asked to pose a counsel on that, and that is correct. And if it doesn't ---- I'm going to be repetitive. If it doesn't ---- if the video does not blatantly contradict one version, one party's version or the other, then you have a dispute, and it goes to the jury. And the judge's statement of it. I mean, that's more of the nonsense. And that was one of the most important rulings by Judge Lawson in his 38-page opinion. Sorry. Go ahead. Did I cut you off? No, you ---- So I'm ---- Okay. Sorry. I'm not sure I have the answer, but, you know. So, anyways, again, I do think that as we stand here today, the defendants are still arguing that there was blatant resistance, and you cannot tell that in the video. And, again, I don't know what the court's favor is here, whether or not it ---- if I am correct, whether the court says we lack jurisdiction and sends it back, that happened in Shumate in part, and I was the attorney of record for the plaintiff in Shumate. And that was also, as you know, another Taser case. Or if the court says, wait a minute, we're just going to look at the facts most favorable to the plaintiff in any event, and if that's what you do, then here, then clearly there's a jury question. I can respond to other questions, but that's basically my argument. Okay. Thank you. Thank you, Your Honor. Just a few brief points. On the jurisdiction point, there are legal questions here that this court can answer based on the video evidence, and this is what this court discussed in Fagan. For example, did plaintiffs satisfy his burden at summary judgment? Did the officers violate clearly established law? All these things are legal questions that this court can and does consider in these types of appeals. What if the video doesn't clearly show what you think it shows? Eliminate the video, then how would we approach this case? I'm sorry, I missed the first part of your question. What if the video doesn't show to us what you think it shows? Because I don't think a lot is clear on that video. So take the video out. How does that impact your case? If you take the video away, I think that does impact the case, because then you have a he said, she said situation, but I just don't think that's what we have here. I mean, the video is very clear that there was no excessive force. I mean, there's nothing in the video that shows that the officers punched plaintiff, kicked plaintiff, you know, hit plaintiff. I mean, the video, I think, is very clear. You mean they tased him? Four times, and they're on top of him down on the ground. Yeah, absolutely, but I think the law in the circuit is very clear, though, and you're met with the type of active resistance. Well, but then that gets to a prior point. You can't say they didn't do this stuff. The question is whether it's justified by the active resistance, and then we go back to the factual controversy, and is that contradicted by the video? If there's a video of him hitting face when he enters the house or if there's a video of him doing something before he's thrown to the ground, but we don't have that, do we? I mean, I know we've already discussed this, but I think before he's thrown to the ground, we at least have the video showing that he shoved the door in the officer's face, and also there's a scuffle between him and Lieutenant Fays. Of course you can't see above their head, but you can see that they're making contact with one another. He's not just standing there, you know, calmly like someone else would. I know I would when the officers come to my house. I would not slam the door in their face and then physically get in an altercation with them, and so we at least have that in the video, and I think that's important here because all of that happened before he was taken to the ground. Then I also wanted to just make the point that plaintiff has had abundant opportunity to present this court with clearly established law, and they did not do so in the district court, and all the cases they cite on appeal we distinguish in our reply brief, and also none of those cases were cited in the district court for the court to consider. So at the very least, if we consider the qualified immunity question, we went on that point that plaintiff has not presented any clearly established law. And also on the consent point, I just want to say I know we focused a lot on consent, but even if we assume there was no consent here, we're arguing there were exigent circumstances because plaintiff had just assaulted Catherine. Catherine expressed a fear that plaintiff would follow her. You're saying that's exigent circumstances, allowing them to enter the house without consent? At the very least. At the very least from a discussion blocks away? Well, she had expressed a fear that he might follow her either on foot or maybe in a car or any of those types of situations. It was so exigent that they tried the front door, couldn't get it to work with the key, then they sat around, then they decided to go around back. I mean, how exigent was it? Well, right when they opened the door. Don't you need to break the door down or break a window or something if you really think there's an emergency? You're not fiddling with the lock, are you? I think that goes back to what if she would have returned to the house? It certainly could have escalated again. So the threat was still ongoing is what I'm trying to say, I think. Okay. Thank you, counsel. Thank you very much. Thank you both for your arguments and briefs. The case will be submitted.